10 N.Y.2d 108 (1961)
In the Matter of the Attorney-General of the State of New York, Appellant. American Research Council, Inc., Nicolas Darvas et al., Respondents.
Court of Appeals of the State of New York.
Argued June 1, 1961.
Decided July 7, 1961.
Louis J. Lefkowitz, Attorney-General (Samuel A. Hirshowitz, Paxton Blair and Daniel M. Cohen of counsel), for appellant.
Milton A. Bass for respondents.
Judges DYE, FULD and FOSTER concur with Judge FROESSEL; Chief Judge DESMOND dissents in an opinion in which Judges VAN VOORHIS and BURKE concur.
*111 FROESSEL, J.
Petitioners-respondents herein were, by an ex parte order, directed to appear in court with certain books and papers for examination under the so-called Martin Act (General Business Law, art. 23-A). Said order was thereafter vacated at Special Term, and the Appellate Division by a divided court affirmed. Additional background of this litigation is aptly set forth in the Chief Judge's opinion.
The power of the Attorney-General under the Martin Act is exceedingly broad. Indeed, as Judge CARDOZO said in Matter of Ottinger v. State Civ. Serv. Comm. (240 N.Y. 435, 439), the Attorney-General "almost upon mere request * * * may have an examination before trial of parties or of witnesses" in a Martin Act investigation. In People v. Federated Radio Corp. (244 N.Y. 33) we stated (pp. 38-39):
"In a broad sense the term [fraud] includes all deceitful practices contrary to the plain rules of common honesty.
"The purpose of the law is to prevent all kinds of fraud in connection with the sale of securities and commodities and to defeat all unsubstantial and visionary schemes in relation thereto whereby the public is fraudulently exploited. (Hall v. Geiger-Jones Co., 242 U. S. 539.) The words `fraud' and `fraudulent practice' in this connection should, therefore, be given a wide meaning so as to include all acts, although not originating in any actual evil design or contrivance to perpetrate fraud or injury upon others, which do by their tendency to deceive or mislead the purchasing public come within the purpose of the law." (See, also, Matter of Edge Ho Holding Corp., 256 N.Y. 374, 381; Matter of La Belle Creole Int., S. A., v. Attorney-General of State of N. Y., 10 N Y 2d 192, decided herewith.)
In our opinion, there was a sufficient showing for the issuance of the order vacated so as to allow the Attorney-General to inquire "concerning their [petitioners'] practices, transactions *112 and courses of business relating to the promotion, issuance and distribution of investment advice within and from the State of New York" (emphasis supplied), as specifically provided in said order. (See General Business Law, §§ 352, 354.)
The corporate petitioner is a stock corporation. It is registered with the Securities and Exchange Commission as an "investment advisor", pursuant to the Federal Investors Advisory Act of 1940 (U. S. Code, tit. 15, § 80b-2). That means "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, * * * as to the advisability of investing in, purchasing, or selling securities" (id., § 80b-2, subd. [11]). (See, also, General Business Law, § 359-eee.)
The corporate petitioner published Darvas's book, and received compensation by way of a financial profit from every book sold at $4.95. It did more, however, than publish the book. It extensively advertised and conducted a mail-order campaign to high pressure sale of the book "as a useful guide to every individual investor". In its advertisement it stated: "We think the Darvas method will make more and more profits for you as time goes by. Therefore, we make this additional guarantee: EVEN IF YOU KEEP THE BOOK, YOU ARE FREE TO RETURN IT ANY TIME FOR A FULL YEAR AND RECEIVE UNQUESTIONED REFUND if you are not completely satisfied with your improved investment results. Thus, you are doubly protected  return your free examination voucher today." (Only italics supplied.) It is claimed that the very title of the book was misleading, for the Chief Securities Accountant of the Securities Bureau of the Attorney-General's office asserted that it overstated Darvas's alleged profits by multiplying them 10 times. The individual petitioner, Mazel, is president of the Council and, upon being subpnaed by the Attorney-General, invoked his privilege against self incrimination.
The Appellate Division did not agree with all the reasoning of Special Term. It recognized, moreover, that not only the book, but the "other material, including advertisements published by the Council", should be considered along with the publication. As to the book, it stated, when "fairly considered in its entirety it describes certain methods used in specific transactions, actual or fictional, which turned out successfully for the author" (emphasis supplied).
*113 In our opinion, the courts below have applied to the merely inquisitorial order the measure of proof that would be required at a trial. We should not so narrow the scope of the Attorney-General's power under article 23-A of the General Business Law.
The order appealed from should be reversed, and the ex parte order reinstated, with costs.
Chief Judge DESMOND (dissenting).
In December, 1960 an ex parte order was made by Special Term under section 355 of the General Business Law requiring Nicolas Darvas, American Research Council, Inc., publisher of a book written by Darvas, and Bernard Mazel, president of American Research Council, to appear in the court to be examined and to produce relevant papers, records, etc., concerning alleged fraudulent practices "relating to the action which the Attorney General has determined to bring" including all papers and records in regard to the activities of Darvas, Research Council and Mazel "concerning their practices, transactions and courses of business relating to the promotion, issuance and distribution of investment advice within and from the State of New York". At the same time a notice to appear and a subpna was served on Research Council and on Mazel but apparently not on Darvas. The procedure followed was that described in section 354 of the General Business Law (which section is part of the so-called "Martin Act") authorizing the Attorney-General, whenever he has determined to commence an action under the Martin Act, to present to any Supreme Court Justice an application for such examination. The Martin Act is article 23-A of the General Business Law which is headed "Fraudulent Practices in Respect to Stocks, Bonds and Other Securities" and in general authorizes investigation of, and criminal and civil suits because of, frauds in dealings in securities. The whole attack of the Martin Act is against stock frauds of various kinds and, while the sections are very broad in terms and give the Attorney-General broad powers of investigation, their coverage is limited to fraudulent practices in regard to securities. We agree with the courts below that there is nothing in these papers to show any such fraudulent practices and so no basis appears for the inquiry.
It was not until 1960 (L. 1960, ch. 961, § 3, eff. July 1, 1960) that there was added to the Martin Act section 359-eee requiring *114 the registration with the State Law Department of "investment advisors" and prohibiting anyone from engaging in that business without such registration. "Investment advisor" is closely defined in section 359-eee to include persons who for compensation engage in the business of advising members of the public, directly or through writings, as to the value of securities or the advisability of investing or buying or selling securities, etc. All that Darvas did was to write a book, which American Research Council published and which became a best seller, entitled "How I Made $2,000,000 in the Stock Market" and in which Darvas, a professional dancer, wrote an account of his actual or purported experiences in the stock market. The Martin Act should not be and cannot reasonably be construed to deal with such a book. We do not think the Legislature ever intended that the Attorney-General should use his investigatory powers to stop or slow up the sale of such a book, in order to protect venturesome people from their urges to gamble in stocks.
This proceeding was brought on by a motion made by American Research Council and its president Mazel for the vacatur of the ex parte order. The motion was based on an affidavit of respondents' attorney who denied the authority of the Attorney-General to proceed with reference to this book since, according to the affidavit, an "investment advisor" is a person who for "compensation" engages in the business of advising members of the public as to the value or advisability of "investing, purchasing, selling or holding" securities. Neither the Council nor Darvas nor the book, argues the affidavit, has done anything like that. The book, as the affidavit correctly says, is simply an autobiographical work describing, after the manner of Rockefeller, Carnegie, Vanderbilt, Baruch and others, a series of profitable stock ventures, and there is nothing to show any fraudulent purpose or fraudulent act. In opposition there was filed an affidavit of an Assistant Attorney-General. Among other things, the latter pointed out, citing Matter of Ottinger v. State Civ. Serv. Comm. (240 N.Y. 435) and People v. Federated Radio Corp. (244 N.Y. 33), that the Attorney-General has power to investigate anything which looks like a fraudulent practice and that a showing of materiality or relevance is not a prerequisite (see Matter of Edge Ho Holding Corp., 256 N.Y. 374). The Attorney-General's affidavit shows that in promotional material *115 for the book the publisher made statements that the Darvas method would make profits for readers and would serve as a useful guide to investors, etc. But there is a vast difference between selling definite investment advice and trying to get sales for a book by asserting that it will help readers make money. We find nothing in this book advising anyone to do anything although, of course, like every other biography of a successful trader, it may suggest that the wise reader will go and do likewise. Completely absent is any showing of a fraudulent intent unless self-laudation and boasting of one's cleverness is somehow a fraud.
Special Term granted the application to set aside the ex parte order. In its opinion it said that the aim of the proposed examination by the Attorney-General "is conceded to be the suppressing of the publication and further distribution" of the book. In its affirming Per Curiam opinion the Appellate Division wrote that it found in this record no such concession. That is correct but we were told on the argument by respondents' counsel that this concession was made orally at Special Term and the Assistant Attorney-General who argued the appeal in our court did not deny this. The Special Term opinion points out that respondent American Research Council, Inc., has for some reason registered itself as a professional investment advisor with the United States Securities and Exchange Commission but it still remains that there is nothing before us to show that it ever actually engaged in the business of giving investment advice, as distinguished from publishing this book. Certainly the book does not constitute "investment advice" within any reasonable meaning of the term. The Special Term opinion said correctly that there is a real difference between "touting" stocks and publishing as a biographical sketch a narrative of a series of transactions by a named investor. The lower court remarked that the Attorney-General's construction would give him censorship or suppression power over any writing which describes stock transactions or investment principals. To repeat, this book does not make any recommendations of any kind.
The Appellate Division's opinion takes the same ground as did Special Term. One Justice dissented. He wrote that the Attorney-General, before the enactment of the 1960 amendment, *116 had power to proceed against persons "responsible for investment advice that fell within the fraudulent practice proscription of the Martin Act". But nowhere in his opinion do we find any explanation as to how the writing and publication of this biography could be considered to be a "fraudulent practice" under the Martin Act.
The order should be affirmed, with costs.
Order reversed and matter remitted to Special Term for further proceedings in accordance with the opinion herein, with costs in this court and in the Appellate Division.